[Cite as *State v. Junod* , 2019-Ohio-743.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,           CASE NO.  10-18-08

      v.

CLAY A. JUNOD,                O P I N I O N

      DEFENDANT-APPELLANT.

---

**Appeal from Mercer County Common Pleas Court**
**Trial Court No. 17-CRM-033**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:   March 4, 2019**

---

APPEARANCES:

    *Patrick T. Clark* **for Appellant**

    *Matthew K. Fox and Joshua A. Muhlenkamp* **for Appellee**

**SHAW, J.**

{¶1} Defendant-Appellant, Clay A. Junod ("Junod"), appeals the March 19, 2018 judgment of the Mercer County Court of Common Pleas, Criminal Division, journalizing his conviction by a jury on one count of first degree felony Aggravated Robbery, one count of second degree felony Kidnapping, one count of third degree felony Abduction, and one count of first degree misdemeanor Petty Theft. The trial court also found that Junod is a Repeat Violent Offender with respect to the Aggravated Robbery and Kidnapping counts, and sentenced him to an aggregate prison term of twenty-three years.

{¶2} On appeal, Junod argues that his trial counsel provided him with ineffective assistance; that the trial court erred when it overruled his motion for a mistrial; that the prosecutor committed misconduct that prejudiced his case; that his Aggravated Robbery conviction is against the manifest weight of the evidence; that the trial court erred when it found that his Aggravated Robbery and Kidnapping convictions did not merge as allied offenses; and that the trial court erred in imposing the court-appointed attorney's fees without first finding that he had the ability to pay those fees.

*Procedural History*

{¶3} On April 20, 2017, the Mercer County Grand Jury returned a six-count indictment against Junod alleging that he committed Count One: Aggravated

Robbery, in violation of R.C. 2911.01(A)(1), (C), a felony of the first degree, with a Firearm specification under R.C. 2941.145(A), a Repeat Violent Offender specification pursuant to R.C. 2941.149(A), and a specification for Forfeiture of a Weapon pursuant to R.C. 2941.1417(A) attached; Count Two: Felonious Assault, in violation of R.C. 2903.11(A)(2), (D)(1)(a), a felony of the second degree, with a Firearm specification under R.C. 2941.145(A), a Repeat Violent Offender specification pursuant to R.C. 2941.149(A), and a specification for Forfeiture of a Weapon pursuant to R.C. 2941.1417(A) attached; Count Three: Kidnapping, in violation of R.C. 2905.01(B)(2), (C)(1), a felony of the second degree, with a Firearm specification under R.C. 2941.145(A), a Repeat Violent Offender specification pursuant to R.C. 2941.149(A), and a specification for Forfeiture of a Weapon while under Disability pursuant to R.C. 2941.1417(A) attached; Count Four: Abduction, in violation of R.C. 2905.02(A)(2), (C), a felony of the third degree, with a Firearm specification under R.C. 2941.145(A) and a specification for Forfeiture of a Weapon while under Disability pursuant to R.C. 2941.1417(A) attached; Count Five: Having Weapons while under Disability, in violation of R.C. 2923.13(A)(2), (B), a felony of the third degree, with a Firearm specification under R.C. 2941.145(A) and a specification for Forfeiture of a Weapon while under Disability pursuant to R.C. 2941.1417(A) attached; and Count Six: Petty Theft, in violation of R.C. 2913.02(A)(1), (B)(2), a misdemeanor of the first degree.

{¶4} On August 3, 2017, the prosecution filed a Bill of Particulars setting forth the details of the offenses listed in the indictment. Specifically, Junod was alleged to have entered the Best Western Hotel in Celina, Ohio, on April 9, 2017 with a handgun on or about his person. Upon encountering the employee at the front desk, Junod brandished the weapon while restraining the employee and demanding money. Junod received $134.00 through the commission of this conduct. The State further alleged that Junod had been under indictment or convicted of a felony offense at the time he committed the offenses.

{¶5} On February 21, 2018, the prosecution entered a *nolle prosequi* on the Firearm and Forfeiture of a Weapon specifications on Counts One and Two; on the Firearm and Forfeiture of a Weapon while under Disability specifications on Counts Three and Four; and on Count Five, the Having Weapons while under Disability charge, and the attached Firearm and Forfeiture of a Weapon while under Disability specifications.

{¶6} On February 21 and 22, 2018, the trial court conducted a jury trial on the remaining charges and specifications listed in the indictment. The jury found Junod guilty on Count One: Aggravated Robbery; Count Three: Kidnapping; Count Four: Abduction; and Count Five (formerly Count Six): Petty Theft. The jury found Junod not guilty on Count Two: Felonious Assault. The trial court set a hearing on the Repeat Violent Offender specifications attached to the Aggravated Robbery and

Kidnapping charges, on the issue of merger, and on sentencing. Defense counsel filed a written objection to the trial court's use of Junod's prior 1999 conviction for Attempted Murder in its consideration of the Repeat Violent Offender specifications based upon the fact that Junod was a juvenile when the crime was committed.

{¶7} On March 19, 2018, the trial court issued its judgment entry of conviction and sentence. Specifically, the trial court found Junod to be a Repeat Violent Offender on Counts One and Three based upon his 1999 conviction. With respect to the merger doctrine, the trial court noted that the prosecution stipulated that Counts Three and Four, Kidnapping and Abduction, were allied offenses of similar import and the prosecution elected to proceed on the Kidnapping conviction. The trial court also found that the remaining counts of Aggravated Robbery, Kidnapping, and Petty theft were not allied offenses of similar import, and therefore did not merge for purposes of sentencing. The trial court then imposed an eleven year prison term for Count One: Aggravated Robbery with an additional ten year prison term for the attached Repeat Violent Offender specification; a two year prison term on Count Three: Kidnapping; and a six month term of incarceration for Count Five (formerly Count 6): Petty Theft. The trial court ordered the prison terms for Count One, the attached specification, and Count Three to run consecutively, and the term of incarceration in Count Five (formerly Count 6) to run concurrently,

for a total prison term of twenty-three years. Junod was also ordered to pay court costs and court appointed counsel fees.

{¶8} Junod subsequently filed a notice of appeal from the trial court's judgment entry of conviction and sentence, asserting the following assignments of error.

### FIRST ASSIGNMENT OF ERROR

**CLAY JUNOD WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO OBJECT TO INFLAMMATORY RELIGIOUS STATEMENTS MADE BY THE STATE IN OPENING AND CLOSING ARGUMENTS; FAILED TO OBJECT TO THE STATE REFERENCING A PRIOR CONVICTION; CONDUCTED VOIR DIRE THAT ALERTED THE VENIRE TO THE EXISTENCE OF A PRIOR CONVICTION; AND FAILED TO ADEQUATELY ARGUE THAT A MISTRIAL WAS WARRANTED. FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16, OHIO CONSTITUTION. TRIAL TR. VOL. 1, P. 68, 84, 144; TRIAL TR. VOL. 2, P. 309-310, 473-474, 482.**

### SECOND ASSIGNMENT OF ERROR

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED CLAY JUNOD'S MISTRIAL REQUEST. FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16, OHIO CONSTITUTION. TRIAL TR. VOL. 2, P. 309-310.**

### THIRD ASSIGNMENT OF ERROR

**PROSECUTORIAL MISCONDUCT DENIED CLAY JUNOD A FAIR TRIAL AND DUE PROCESS OF LAW. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS, UNITED STATES**

**CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16, OHIO CONSTITUTION. TRIAL TR. VOL. 2, P. 474-474, 482.**

**FOURTH ASSIGNMENT OF ERROR**

**THE TRIAL COURT VIOLATED CLAY JUNOD'S RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION FOR AGGRAVATED ROBBERY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTIONS 10 AND 16 OHIO CONSTITUTION; *STATE v. THOMPKINS*, 78 OHIO ST.3d 38, 387, 678 N.E.2d 541 (1997); SENTENCING T. P. 57-58. T.D. 187.**

**FIFTH ASSIGNMENT OF ERROR**

**THE TRIAL COURT ERRED IN SENTENCING CLAY JUNOD, WHEN IT DETERMINED THAT HIS AGGRAVATED ROBBERY AND KIDNAPPING CONVICTIONS SHOULD NOT MERGE AS ALLIED OFFENSES. R.C. 2941.25; *STATE v. RUFF*, 143 OHIO ST.3d 114, 2015-OHIO-995, 34 N.E.2d 892; SENTENCING T.P. 31-38.**

**SIXTH ASSIGNMENT OF ERROR**

**THE TRIAL COURT ERRED IN SENTENCING CLAY JUNOD WHEN IT IMPOSED COSTS OF COUNSEL WITHOUT FIRST FINDING THAT HE HAD THE ABILITY TO PAY THOSE COSTS. SIXTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; *FULLER v. OREGON* , 417 U.S. 40, 94 S.Ct. 2116, 40 L.ED.2d 642 (1974); R.C. 2941.51(D); T.D. 187.**

**{¶9}** For ease of discussion, we elect to address some of the assignments of error together and out of order.

*Fourth Assignment of Error*

{¶10} In his fourth assignment of error, Junod challenges his conviction for Aggravated Robbery as against the manifest weight of the evidence. Specifically, Junod claims that the State failed to demonstrate that he used a deadly weapon during the commission of the offense due to the fact that it was later determined that Junod used a BB gun during the robbery.

*Standard of Review*

{¶11} In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*. Nevertheless, a reviewing court must allow the trier of fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v.*

*Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

*Evidence Presented at Trial*

{¶12} Kaitlan Jones testified that on April 9, 2017, she was working as a front desk clerk at the Best Western Hotel in Celina, Ohio. Ms. Jones testified that at approximately 4:00 p.m., a man whom she identified as Junod, walked into the lobby and asked for an employment application. Junod then asked Ms. Jones where the restroom was located and she directed Junod to its location. Upon returning to the lobby from the restroom, Junod sat on the couch in the lobby. Ms. Jones recalled watching Junod on the cameras in the lobby while in the office behind the front desk. Ms. Jones observed strange behavior from Junod; specifically that he continued to look in different directions to see if anyone else was present. Upon observing Junod stand up from the couch and approach the area, Ms. Jones met Junod at the front desk.

{¶13} Ms. Jones recalled inquiring if Junod had completed the employment application. As she reached out to take the application, Junod aggressively grabbed her wrist, held it down on the desk, and brandished a gun. Ms. Jones testified that the gun was sitting on the counter pointed at her stomach, which especially alarmed her being that she was four and half months pregnant. Junod asked Ms. Jones if anyone else was present. Ms. Jones responded that she was the only employee on

the shift, but guests were in the hotel. Junod then demanded money, which prompted Ms. Jones to give him $134.00 from the cash drawer behind the desk. Junod asked Ms. Jones if she knew anything about the two cars in the parking lot and whether there was money inside. Ms. Jones replied that she did not know about either car and Junod left the hotel.

{¶14} Ms. Jones recalled being terrified for her life and the life of her unborn child. After Junod left, she grabbed the hotel keys, ran to the employee bathroom, locked herself inside, and called the Celina Police Department. She gave a detailed description of Junod to the dispatcher.

{¶15} Shortly thereafter, Sergeant Colin Fuelling of the Celina Police Department arrived at the hotel. He encountered Ms. Jones in the bathroom. He recalled that she was very shaken and quivering in fear. Ms. Jones recounted the details of the incident and gave a description of the suspect to Sgt. Fuelling, who asked to see the footage from the hotel's surveillance cameras. Ms. Jones contacted Muhammed Khokar, the owner of the hotel, who provided Sgt. Fuelling with the surveillance footage. Mr. Khokar also authenticated the video surveillance footage that was played for the jury and admitted as Exhibit 2 at trial. This footage depicts the events from two vantage points: one from behind the clerk's desk where Ms. Jones was located during the robbery, and the other from the lobby where both the front entrance and the customer side of the clerk's desk can be viewed.

{¶16} The video footage shows a man, dressed in jeans, a white and green striped polo shirt, black hooded jacket, and sun glasses on top of his head, approaching Ms. Jones and grabbing her right wrist with his left hand as she takes a piece of paper from him. At the same time, the man brandishes what appears to be a black pistol in his right hand and points the gun at her. The video footage shows that the man continues to hold Ms. Jones' wrist down on the counter and lowers the gun, eventually concealing it under his coat, while speaking to her. He then releases Ms. Jones' hand and she walks to the cash register to take out the money. Once given the money, the man walks out the front entrance.

{¶17} Sgt. Fuelling testified that he immediately recognized Junod upon viewing the surveillance footage. He explained that he had encounters with Junod in the past and was familiar with him. While Sgt. Fuelling gathered evidence at the hotel, Officer Gabriel Bartlett with Celina Police Department secured the area and began tracking Junod with his K-9 partner, Peng. While tracking, Officer Bartlett received a call about an unidentified male walking through a nearby residential yard. Michael Staugler was the person who informed law enforcement about this suspicious activity.

{¶18} Mr. Staugler testified that he lives approximately four blocks from the hotel, and on the afternoon of April 9, 2017, he observed a male walking on his property line, which according to him was unusual. Shortly thereafter, Mr.

Staugler's wife received a phone call from a friend regarding an armed robbery in the vicinity and was instructed to stay indoors. At approximately 4:30 p.m., Mr. Staugler recalled looking into his yard where he had seen the person walking, and noticed something white laying on the lawn. He went into the yard to inspect the object and found a shirt and a pair of sunglasses. He explained that he had just been working in the yard prior to seeing the individual and knew the items had not been there before. Mr. Staugler gathered the items and drove them to one of the Sheriff's Deputies who was investigating nearby.

{¶19} Although he was not able to identify the individual he saw walking on his property, Mr. Staugler was able to give a general description of the person, which matched Junod, and he was also able to identify at trial the green and white striped polo shirt and sunglasses that he found in his yard. The items, as well as pictures of them, were admitted as exhibits at trial, and were similar to those items worn by the man on the surveillance footage. Officer Bartlett further testified that he and Peng were unsuccessful in tracking the suspect that afternoon.

{¶20} Officer Ronald Waltmire of the Celina Police Department testified that he arrived at the hotel and observed a "very traumatized" Ms. Jones and recalled that it took her some time to calm down. (Trial Tr. 379). He viewed the surveillance footage and also recognized Junod. Officer Waltmire explained that he encountered Junod on a prior complaint concerning a separate incident on the same stretch of

road two months before in February 2017. Officer Waltmire asked other officers to confirm Junod's identification from photos and then contacted the prosecutor's office. The decision was made to obtain a warrant for Junod's arrest. Once the warrant was obtained, Officer Waltmire entered the information regarding the offense into the LEADS-NCIC law enforcement database. In the meantime, Celina Police continued to look for Junod.

**{¶21}** The next day, on April 10, 2017, Officer Chad Kunkleman of the Lima Police Department was on bicycle patrol when he observed suspicious conduct in the parking lot of a local hotel in Lima known for illicit drug activity. Officer Kunkleman approached a red SUV with out-of-county plates and spoke to the two females seated inside. Officer Kunkleman observed a rolled marijuana cigarette in the driver's hand. Officer Kunkleman obtained consent to search the vehicle and found a man curled up in the back of the SUV facing the back seat. Officer Kunkleman ordered the man out of the vehicle. He patted the man down and found an Ohio Driver's License identifying the man as Junod. Officer Kunkleman then learned of the outstanding warrant for Junod's arrest. Officer Kunkleman returned to the vehicle and found a gun and two cellphones laying where Junod had been situated in the back of the SUV. When Officer Kunkleman picked up the gun and examined it, he realized it was a BB gun. Junod was taken into custody by Lima Police and extradited to Mercer County. The evidence found in Lima was also

turned over to Celina Police. The BB gun and a photo of the gun were admitted as exhibits and identified by Officer Kunkleman at trial.

*Discussion*

{¶22} On appeal, Junod claims that his conviction for Aggravated Robbery is against the manifest weight of the evidence because the State failed to demonstrate that the BB gun used during the commission of the offense is a deadly weapon.

{¶23} Junod was convicted of Aggravated Robbery, in violation of R.C. 2911.01(A)(1), which states:

> **(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:**
>
> **(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it  \* \* \*.**

{¶24} Section 2923.11(A) of the Revised Code defines a "Deadly Weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." "An instrument, no matter how innocuous when not in use, is a deadly weapon if it is of sufficient size and weight to inflict death upon a person, when the instrument is wielded against the body of the victim or threatened to be so wielded." *State v.*

*Clark*, 5th Dist. Muskingum No. CT2018-0006, 2018-Ohio-4789, ¶ 58, citing *State v. Deboe*, 62 Ohio App.2d 192, 193-94 (6th Dist.1977). "The manner of use of the instrument, its threatened use, and its nature determine its capability to inflict death." *Id*. A factfinder may "infer the deadly nature of an instrument from the facts and circumstances of its use." *State v. Vondenberg*, 61 Ohio St.2d 285, 289 (1980).

**{¶25}** Although not a firearm, a BB gun can be a deadly weapon if the BB's are expelled at a sufficient rate of speed. *State v. Johnson*, 5th Dist. Stark No. 2014CA00189, 2015-Ohio-3113, ¶ 49. Even if the BB's are not powerful enough to cause death, a BB gun can be a deadly weapon if used as a bludgeon. *State v. Bitting*, 9th Dist. Summit No. 2017-Ohio-2955, ¶ 13. *See State v. Smith*, 8th Dist. Cuyahoga No. 94167, 2011-Ohio-306, ¶ 25 (finding that whether a "real" looking toy gun or a real gun was used to commit aggravated robbery was not dispositive because the evidence established that the fear of the victims was of such a nature that they were induced to part with their property against their will). If no evidence is presented to show that a BB gun can be lethal in its use, it cannot be presumed to be capable of inflicting death. *Johnson*, *supra*, 2015-Ohio-3113, ¶ 50 citing *State v. Brown*, 101 Ohio App.3d 784 (1st Dist.1995).

**{¶26}** Here, the State presented testimony from Officer Kunkleman, the Lima law enforcement officer who found the black BB gun in the SUV where Junod

had been hiding. Officer Kunkleman stated that first he thought the gun was the same type of weapon he carries on duty, a Sig Sauer P226 9 millimeter. It was not until he picked up the gun, did he then realize that it was in fact a BB gun because it had a $CO_2$ cartridge instead of a magazine. He further explained that the BB gun was not as heavy as his pistol, but it also was not light. Officer Kunkleman testified that based on his experience and training "[a] BB gun can inflict physical serious [sic] harm at close range by shooting an eye out, puncture your skin, it can cause physical harm to you." (Trial Tr. at 280). He further stated that a BB gun could indeed cause death.

{¶27} Officer Kunkleman testified that a BB gun could be used in a manner other than shooting, "you could use it to hit somebody, just like you would a bat or anything else like that." (Trial Tr. at 280-81). In addition, Officer Waltmire testified that the specific BB gun found in the SUV was "a Powerline pellet gun .177 range." (Id. at 408). He further stated that he was familiar with cases in which a similar gun has caused death. He explained that the BB gun can be "used to fire, using air cartridge to fire pellets that would cause serious injury or death, could be used as a blunt force object, it could be used for many different ways." (Id.).

{¶28} There was also a considerable amount of evidence presented establishing that Ms. Jones believed the gun Junod used during the robbery was a "real" firearm. Aside from Ms. Jones' testimony stating that she was terrified and

felt like her life was being threatened, the 9-1-1 call Ms. Jones made after the robbery was also admitted as an exhibit. On this recording, her voice is shaky and she is clearly overwhelmed by fear. Testimony from the law enforcement officers who encountered Ms. Jones at the scene described her as "very shaken," "quivering," "very traumatized," "nervous," and "it took a while for her to get to the point of calming down." (Trial Tr. at 331, 379-80).

{¶29} Based on the foregoing discussion, we find that the testimony along with the exhibits presented at trial constitute ample evidence to support the jury's finding that the BB gun used by Junod during the commission of the Aggravated Robbery is a deadly weapon as defined by R.C. 2923.11(A). Accordingly, we conclude that Junod's conviction for Aggravated Robbery is not against the manifest weight and the fourth assignment of error is overruled.

*First, Second, and Third Assignments of Error*

{¶30} On appeal, Junod asserts error based on two aspects of the prosecution's presentation of its case at trial.

*A. Repeat Violent Offender Specification*

{¶31} The record reflects that the Aggravated Robbery, Felonious Assault, and Kidnapping offenses charged in the indictment were each accompanied by a Repeat Violent Offender Specification ("RVO"). On the first day of trial, the State, defense counsel, and apparently the trial court, were all under the mistaken

Case No. 10-18-08

impression that the RVO specification was an issue to be tried to the jury, instead of being tried to the bench as provided for in R.C. 2941.149(A).[1] As a result, the State discussed Junod's prior 1999 conviction for attempted murder in front of the jury during voir dire and opening statements, without objection from defense counsel.

{¶32} After the first day of trial, and before any evidence of Junod's prior conviction was introduced, the State brought the matter to the trial court's attention. Defense counsel moved for a mistrial and requested that a new jury be empaneled. The trial court overruled Junod's motion for a mistrial and instead gave the following curative instruction upon the jury reconvening for trial on the second day.

> **In jury selection and opening statement, reference was made to a prior conviction and a repeat violent offender specification. The jury shall disregard that information and not consider it for any purpose. There will not be any evidence of a prior conviction or a repeat violent offender specification.**
>
> **As with the other Court instructions, you're required to follow these instructions.**

(Trial Tr. at 325).

{¶33} Junod challenges the handling of the RVO specification at trial in two respects. First, he claims that his counsel was ineffective for failing to object to the

---

[1] R.C. 2941.149(B) specifically states that "[t]he court shall determine the issue of whether an offender is a repeat violent offender." *See also*, *State v. Brown,* 5th Dist. Stark No. 2014CA00102, 2015-Ohio-1006; *State v. Bostick*, 9th Dist., 2013-Ohio-5784, ¶ 14; *State v. Hunt*, 10th Dist. Franklin No. 12AP-1037, 2013-Ohio-5326, ¶ 76, (recognizing that a defendant may waive a jury on a weapons under disability charge but, "by statute," the repeat violent offender specification "is to be determined by the court rather than the jury").

-18-

State's discussion of his prior conviction in front of the jury and second, he claims that the trial court erred by overruling his motion for a mistrial. We shall address each argument in turn.

### 1. Ineffective Assistance of Counsel

**{¶34}** "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [court] cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To establish a claim of ineffective assistance of counsel, a defendant must show that the performance of trial counsel was deficient and that the deficient performance prejudiced him. *State v. Finfrock*, 3d Dist. Allen Nos. 1-18-42, 1-18-43, 1-18-44, 2018-Ohio-5057, ¶ 19, citing *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

**{¶35}** To prove an allegation of ineffective assistance of counsel, Junod must satisfy a two-prong test. First, Junod must establish that his trial counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. To demonstrate that counsel's performance was deficient, the defendant must show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed

by the Sixth Amendment. *State v. Canada*, 10th Dist. Franklin No. 14AP-523, 2015-Ohio-2167, ¶ 89; *State v. Murphy*, 91 Ohio St.3d 516, 524 (2001) ("To prevail on such a claim, a defendant must show that counsel's actions were professionally unreasonable."). In doing so, the defendant must overcome the strong presumption that counsel's performance was adequate or that counsel's actions might be considered sound trial strategy. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 180.

{¶36} Second, Junod must demonstrate that he was prejudiced by counsel's performance. *Strickland*, 466 U.S. at 687. To show that he has been prejudiced by counsel's deficient performance, Junod must prove that, but for counsel's errors, the result of the trial would have been different. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. Conjectural evidence—predictions about what evidence could possibly be without a basis in the record—does not support a showing of prejudice to establish a claim of ineffective assistance of counsel. *Columbus v. Oppong*, 10th Dist. No. 15AP-1059, 2016-Ohio-5590, ¶ 35.

{¶37} The failure to make either the deficiency or prejudice showing defeats a claim of ineffective assistance of counsel. *State v. Frye*, 10th Dist. Franklin Nos. 14AP-988, 14AP-989, ¶ 11, citing *Strickland* 466 U.S. at 697. Thus, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. * * * If it

is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland* at 697.

{¶38} At the outset it is our conclusion that trial counsel's failure to be familiar with the relevant law regarding the proper procedure for trying the RVO specification and thereby allowing Junod's prior conviction to be discussed in front of the jury without objection, was clearly deficient and fell below an objective standard of reasonable representation as to this issue under the first prong of *Strickland*. However, despite trial counsel's failure in this respect, the record does not demonstrate that but for this error, the outcome of the trial would have been different under the second prong of *Strickland.*

{¶39} Specifically, the record indicates that trial counsel questioned potential jurors whether their ability to render a fair and impartial decision would be affected by their awareness of Junod's prior felony conviction. None of the jurors raised their hands. Defense counsel then asked whether any of the jurors believed "that a person who commits a felony is more likely than another person to commit another felony." (Trial Tr. at 144). Two potential jurors raised their hands. Trial counsel further questioned these jurors. One juror indicated that the amount of time that had passed since the prior felony was important and stated "sometimes people do things when they're quite young that they wouldn't do once they were older." (Id. at 145).

This juror also affirmatively stated that her ability to render a fair and impartial decision would not be impacted by Junod's prior conviction. The second juror was less convincing in her answer, indicating that a person may "[n]ot necessarily [commit] a similar crime," * * * "but maybe—maybe another crime." (Id. at 146). Notably, the second juror was excused and did not become part of the empaneled jury.

{¶40} Thus, in addition to the curative jury instruction given by the trial court ordering the jury to disregard any mention of Junod's prior conviction, this case is somewhat unique in that we also have a direct dialogue with members of the jury on voir dire regarding their ability to be fair and impartial despite knowledge of Junod's prior conviction. Finally, the record demonstrates that the evidence of Junod's guilt, which included a video recording of Junod committing the offenses, was overwhelming. As a result, we cannot say that Junod has established that he was prejudiced by trial counsel's error. Consequently, we find trial counsel's error to be harmless and not a sufficient basis to constitute ineffective assistance of counsel.

*2. Mistrial*

{¶41} Junod also claims that his counsel was ineffective for failing to "adequately" argue that a mistrial was warranted. However, we find no basis in the record to support Junod's claim that his counsel's performance was deficient in this

respect. As soon as trial counsel became aware of the error, he promptly moved for a mistrial on the basis the jury was "tainted" by the knowledge of Junod's prior conviction. Junod's claim that trial counsel's motion was inadequately argued is merely an assertion based on conjecture on his part and does not substantiate a claim for ineffective assistance of counsel on this point.

**{¶42}** Junod further assigns error to the trial court's decision to overrule his motion for a mistrial based on the mistaken discussion of his prior conviction in front of the jury during voir dire and opening statement.

**{¶43}** An appellate court reviewing a trial court's decision on a motion for mistrial defers to the judgment of the trial court, as it is in the best position to determine whether circumstances warrant a mistrial. *State v. Glover*, 35 Ohio St.3d 18, 19 (1988). Thus, we review a trial court's decision for an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 182 (1987). An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶44}** In determining whether a defendant was deprived of a fair trial, we must determine whether, absent the error or irregularity, "the jury would have found the appellant guilty beyond a reasonable doubt." *State v. Morris*, 10th Dist. Franklin Nos. 18AP-208, 18AP-209, 2018-Ohio-5252, ¶ 44, citing *State v. Maurer*, 15 Ohio St.3d 239, 267 (1984). To determine whether the error resulted in prejudice, we

must consider (1) the nature of the error, (2) whether an objection was made, (3) whether the trial court provided corrective instructions, and (4) the strength of the evidence against the defendant. *Id.*

{¶45} The Supreme Court of Ohio has held that where reference to a prior arrest or conviction was fleeting and promptly followed by a curative instruction, such a reference did not unfairly prejudice the accused so as to require a mistrial. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961. Furthermore, a jury is presumed to follow the instructions, including curative instructions, given to it by a trial judge. *State v. Garner*, 74 Ohio St.3d 49, 59, 1995-Ohio-168.

{¶46} Here, we find the curative instruction, together with some direct input from the jury favorable to Junod on the matter, remedied any prejudicial detriment to Junod. Moreover, in light of the overwhelming evidence of Junod's guilt, the record clearly supports the conclusion that even absent the erroneous comments about the prior conviction, the jury would have found Junod guilty of the offenses that it did beyond a reasonable doubt. Accordingly, we conclude the trial court's decision to deny Junod's motion for a mistrial was not an abuse of its discretion.

*B. Prosecutor's Religious Statements*

{¶47} In his third assignment of error, Junod argues that the prosecutor made religious references during opening, closing, and rebuttal arguments that were

improper and deprived him of his right to a fair trial. Junod also argues that his trial counsel was ineffective for failing to object to the prosecutor's comments.

{¶48} At trial, the prosecutor initially framed Junod's conduct in biblical terms, telling the jury during opening statement.

> **Thou shall not steal. This, is the eighth of ten commandments, is just one of the Biblical laws of ethics and worship given by God to Moses on Mount Sinai. And it sounds easy to understand, and easy to follow, but as we all know from living in the real world, apparently following the eighth commandment is not easy for everyone.**
>
> **In our modern society, it turns out that some people struggle with this concept, or at least with implementing the concept into their lives. So much so, that Ohio now has hundreds of pages of criminal laws for people to follow. Certainly have come a long way since those first ten commandments.**
>
> **One such person who struggled to embrace this eighth commandment is this Defendant, Clay Junod.**

(Tr. at 68-69).

{¶49} However and more significantly, the prosecutor then elaborated upon the biblical theme in closing argument:

> **Ladies and gentlemen, I began this process yesterday with you and talked to you about the eighth of the ten commandments, thou shalt not steal, from the—God gives them to Moses on Mount Sinai. We talked about that people have struggled implementing that commandment into their life. I did a little more research on that, and what I found out was that when they talk about steal in the Bible and the eighth commandment, what they're really talking about was not the taking of people's property back then. What they were talking about was an interpretation that stealing is really kidnapping, stealing an actual person. Thou shalt not**

**kidnap is probably more likely a better title for the eighth commandment than we understand it to be, thou shalt no steal. How fitting, when we analyze Mr. Junod's conduct in this case. He kidnapped, abducted, stole, felonious assaulted and committed the offense of aggravated robbery under Ohio law. For these crimes, I ask you to find him guilty. Thank you.**

(Tr. at 473-74).

{¶50} And again, on rebuttal:

**Ladies and Gentlemen, when you go back to the jury room, I want to leave you with one last thought, which is a quote from a movie. I'm a bit of a movie buff. I recently watched the movie The Kite Runner. It was popular a few years ago, and cycled back up on our Netflix. And there is a quote in that movie, and it's about stealing. And it says that there is only one sin, only one, that's theft, because every other sin is a variation of theft. When you kill a man, you steal his life. When you steal his wife's right to a husband, when you kill him, you rob the children of their father. When you tell a lie, you steal someone's right to the truth. And when you cheat, when you steal, you steal someone's right to fairness.**

**Mr. Junod stole. He committed that sin.**

(Tr. at 481-82).

{¶51} On appeal, Junod claims that "there is a strong possibility that he would have been acquitted of aggravated burglary [sic], but for the State's inflammatory and improper argument." (Appt. Br. at 15). In this instance, we find the prosecutor's discussion of his opinion on biblical interpretation during the trial, and in particular the comments in closing argument, to be highly improper and erroneous. The prosecutor's comments clearly constituted an improper attempt to

appeal to the juror's religious values and in doing so, encourage them to assess the evidence in the case according to biblical standards of morality in lieu of the criminal laws of this state. Of particular note in this regard is the prosecutor's suggestion that under his interpretation of the biblical standards of morality, any evidence sufficient to establish a theft would inherently constitute the offenses of kidnapping and robbery as well. As such, we find these comments clearly constitute error as well as prosecutorial misconduct. And of course, it is well-established that it is solely the duty of the trial judge to instruct the jury on the law.

{¶52} Nevertheless, in order for Junod to prevail on a claim for prosecutorial misconduct, he must not only demonstrate that a prosecutor did or said something improper, but he must also show that the conduct prejudicially affected his rights. *State v. Smith*, 14 Ohio St.3d 13, 14, (1984). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982). We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper conduct. *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001). *State v. Tenace*, 109 Ohio St.3d 255, 262, 2006-Ohio-2417, ¶ 45.

{¶53} Using these standards, we find no basis for reversing Junod's convictions based upon the prosecutor's comments. Even though we find the

prosecutor's comments to exceed the line of impropriety, these comments were not so pervasive that they undermined the overwhelming amount of evidence supporting the jury's verdicts. Moreover, the trial court properly instructed the jury on each and every element of the offenses, which instructions would presumptively supersede and cure any misleading comments by the prosecutor as to which legal standards to apply to the factual evidence. We further note that the jury's acquittal on the felonious assault charge demonstrates that they were discerning with the evidence presented and the instructions given to them by the trial court. Therefore, we are unconvinced that the result of Junod's trial would have been different without the improper religious commentary by the prosecution. Thus, we conclude that the erroneous statements made by the prosecutor did not substantially prejudice Junod so as to deny him a fair trial.

**{¶54}** Likewise, we find that defense counsel's failure to object to the impropriety of the prosecutor's biblical references fell below the objective standard of reasonable representation on this issue under the first prong of *Strickland.* However, for reasons already discussed, we do not find that Junod was prejudiced by his counsel's failure to object to these comments under the second prong of *Strickland.* Accordingly, we conclude that this claim also is insufficient to constitute ineffective assistance of counsel.

**{¶55}** In sum, although we find error in the trial counsel's failure to object to both the discussion of Junod's prior conviction and the prosecutor's improper comments, we do not find that Junod was prejudiced by trial counsel's errors. Therefore, we overrule the first assignment of error and find no reversible error on the basis of ineffective assistance of counsel. We also overrule the second assignment of error and find that the trial court did not abuse its discretion in overruling Junod's motion for a mistrial due to Junod not being prejudiced and the outcome of his trial not being altered by the discussion of his prior conviction. Finally, we overrule the third assignment of error on the basis that even though the prosecutor made improper comments, the record demonstrates that those comments did not deprive Junod of a fair trial.

### Fifth Assignment of Error

**{¶56}** In his fifth assignment of error, Junod claims that the trial court erred when it failed to merge his convictions for Aggravated Robbery and Kidnapping at sentencing. Specifically, Junod argues that the trial court erred when it determined that his conduct comprising the two offenses were of dissimilar import.

### Legal Standard

**{¶57}** "A defendant bears the burden of proving that the offenses for which he has been convicted and sentenced constitute allied offenses of similar import." *State v. Johnson*, 3d Dist. Allen No. 1-16-41, 2017-Ohio-6930, ¶ 13, quoting *State*

*v. Campbell*, 12th Dist. Butler No. CA2014-06-137, 2015-Ohio-1409, ¶ 18. Additionally, a reviewing court may look to the information contained in the record to make its allied offense determination. *Johnson*, at ¶ 13. An appellate court then reviews *de novo* the question of whether offenses are allied offenses of similar import. *State v. Potts*, 3d. Dist. No. 5-16-03, 2016-Ohio-5555, ¶ 93.

{¶58} Section 2941.25 of the Revised Code prohibits the imposition of multiple punishments for the same criminal conduct, and provides that:

> **(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**

> **(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

{¶59} In determining whether offenses are allied, courts are instructed to consider three separate factors: the conduct, the animus, and the import. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph one of the syllabus. Convictions do not merge and a defendant may be sentenced for multiple offenses if any of the following are true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus. *Id*. at ¶

25. Two or more offenses of dissimilar import exist "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id*. at paragraph two of the syllabus.

{¶60} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Ruff*, 143 Ohio St.3d 114 at ¶ 26. As a result, this analysis "may result in varying results for the same set of offenses in different cases." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 52. When determining whether multiple offenses merge pursuant to R.C. 2941.25, a court must review the entire record. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, ¶ 24. The burden is on the defendant to establish his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act. *State v. Lewis*, 12th Dist. Clinton No. CA2008-10-045, 2012-Ohio-885, ¶ 14.

*Discussion*

{¶61} At sentencing, Junod's counsel argued that the convictions for Aggravated Robbery and Kidnapping should merge because Junod perpetrated the crimes upon the same victim and with a single animus. Specifically, Junod's counsel argued that the Junod's conduct of grabbing and holding down Ms. Jones' wrist, which constituted the Kidnapping was merely incidental to the Aggravated Robbery. The trial court disagreed and concluded that the Junod's commission of

the offenses were of dissimilar import. Notably in this regard, we observe that the Aggravated Robbery as charged in the indictment only required a theft offense and the possession, use or brandishment of the gun and did not require the use of any force.

{¶62} Moreover, the record demonstrates there were two separate victims in this case, Best Western and Ms. Jones. Both were identified as victims of the Aggravated Robbery offense in the indictment, while Ms. Jones was the sole victim of the Kidnapping offense. We agree with the trial court that these offenses were of dissimilar import not only because there were two separate victims, but also because Junod's commission of the offenses caused separate and distinct harms; the psychological, mental, or emotional harm to Ms. Jones and the economic harm to Best Western. *See e.g., State v. Potts*, 3d Dist. Hancock No. 5-16-03, 2016-Ohio-5555, ¶ 98 (separate victims); *State v. Johnson*, 3d Dist. Allen No. 1-16-41, 2017-Ohio-6930, ¶ 18 (separate and distinct harms).

{¶63} Given the facts and circumstances of the case, we find that Junod separately committed Aggravated Robbery and Kidnapping and such are not crimes of similar import under the facts presented. As such, the trial court's determination that the two convictions were not subject to merger for sentencing purposes was supported by the record, and Junod's fifth assignment of error is overruled.

*Sixth Assignment of Error*

**{¶64}** In his sixth assignment of error, Junod argues that the trial court erred when it ordered him to pay court-appointed counsel fees without considering his ability to pay the fees before they were imposed.

**{¶65}** At the outset, a trial court's order to pay court-appointed counsel fees is distinguishable from both court costs and financial sanctions. Court-appointed counsel fees and expenses approved by a court are not court costs or a financial sanction, and they are not directly enforceable as a criminal sanction. R.C. 2941.51(A); *State v. Springs*, 2d Dist. Champaign No. 2015-CA-3, 2015-Ohio-5016, ¶ 9. R.C. 2941.51(D) specifically provides that court-appointed counsel fees "shall not be taxed as part of the costs and shall be paid by the county." Nevertheless, "if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay." R.C. 2941.51(D).

**{¶66}** This Court has previously stated, however, that:

**[A]n indigent defendant may properly be required to pay his attorney fees only after the court makes an affirmative determination on the record in the form of a journal entry, that the defendant has, or reasonably may be expected to have, the**

> **means to pay all or some part of the cost of the legal services rendered to him. The court must then enter a separate civil judgment for the attorney fees or any part thereof that the court finds the defendant has the ability to repay.**

*State v. Ramsey*, 3d Dist. Marion No. 9-10-55, 2012-Ohio-134 ¶ 22, *State v. Johnson*, 3d Dist. No. 16–03–09, 2004-Ohio-1513, ¶ 50, quoting *City of Galion v. Martin*, 3d Dist. No. 3-91-06, \*5 (Dec. 12, 1991).  Here, the trial court failed to make an affirmative finding of Junod's present or future ability to pay court-appointed attorney's fees in its sentencing journal entry.  Moreover, a review of the sentencing transcript does not reveal that the trial court made a determination on the record that Junod is financially able to pay for his court appointed counsel, or make any reference to the PSI, which contained Junod's financial and employment information.  *See, State v. Taylor*, 2d Dist. Montgomery No. 27700, 2018-Ohio-2858, ¶ 37 (Welbaum, J., dissenting), motion to certify allowed, 2018-Ohio-4495, ¶ 37, 154 Ohio St. 3d 1421, and appeal allowed, 2018-Ohio-4495, ¶ 37, 154 Ohio St. 3d 1421 (discussing a conflict between the appellate districts regarding how a trial court satisfies the duty to make an ability-to-pay determination under R.C. 2941.51(D)).

{¶67} To the contrary, with respect to the appeal, the trial court specifically stated:

> **[The] Court finds that you're indigent for purposes of appeal. The Court finds that because you are indigent, and that's been reflected also in the fact that no fines were imposed, you are**

-34-

**entitled to have a lawyer represent you at—at all stages of the appeal. \* \* \* But you have that lawyer to represent you at no cost. You have a right to have a timely appeal filed at no cost to you.**

(Sent. Tr. at 60).

**{¶68}** Accordingly, because the record does not establish that the trial court made a determination regarding the Junod's ability to pay prior to imposing the court-appointed attorney's fees, and because the imposition of the fees appears to be inconsistent with affirmative statements made by the trial court regarding Junod's financial ability, we conclude that the trial court erred in assessing court-appointed attorney's fees in the sentencing entry. Consequently, we vacate that portion of the trial court's judgment imposing the court-appointed attorneys fees and remand this matter for the trial court to either conduct a hearing as to Junod's ability to pay the attorney's fees pursuant to R.C. 2941.51(D) or in the alternative, to file an amended judgment entry that omits the imposition of those attorney's fees. To this extent only, we sustain the sixth assignment of error.

**{¶69}** Based on foregoing, the judgment and sentence of the trial court is affirmed in part and reversed in part.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**ZIMMERMAN, P.J. and PRESTON, J., concur.**

**/jlr**