[Cite as *State v. Cartlidge*, 2020-Ohio-3615.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

LAMAR L. CARTLIDGE,

    DEFENDANT-APPELLANT.

CASE NO. 13-19-44

O P I N I O N

Appeal from Seneca County Common Pleas Court
Trial Court No. 18-CR-0208

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:  July 6, 2020

APPEARANCES:

    *Jennifer L. Kahler* for Appellant

    *Stephanie J. Kiser* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Lamar L. Cartlidge ("Cartlidge") appeals the judgment of the Seneca County Court of Common Pleas, alleging (1) that his conviction is not supported by sufficient evidence; (2) that his conviction is against the manifest weight of the evidence; (3) that he was denied his right to the effective assistance of counsel; (4) that the trial court erred in ordering him to pay court-appointed counsel fees; and (5) that the trial court erred in denying his motion to dismiss for violation of his speedy trial rights. For the reasons set forth below, the judgment of the trial court is affirmed in part and reversed in part.

*Facts and Procedural History*

{¶2} On September 10, 2018, several law enforcement officers met L.S., a confidential informant, at a predetermined location to set up a controlled buy of illegal narcotics. Tr. 120. Detective Sergeant Donald Joseph ("Detective Joseph") conducted a pre-operational search of L.S.'s person. Tr. 124, 141, 165, 217. L.S. was then outfitted with recording devices and given $60.00 of covert funds. Tr. 122, 124, 165, 226. The police recorded the serial numbers of the bills that were issued to L.S. Tr. 138. L.S. informed the law enforcement officers that she had arranged a meeting with Cartlidge to purchase heroin in the parking lot of the public library in Fostoria. Tr. 123, 164, 173, 227.

{¶3} Detective Charles Boyer ("Detective Boyer") dropped L.S. off at a location in the vicinity of the public library in Fostoria and then proceeded to

conduct visual surveillance of the operation. Tr. 227. After she got out of the police car, L.S. walked to the parking lot of the public library where she got into the back of an SUV. Tr. 174. L.S. testified that Cartlidge was sitting in the front seat of the passenger side of this vehicle. Tr. 190. She stated that there was a child in the vehicle and that a woman entered the vehicle while she was there. Tr. 174, 190.

{¶4} L.S. testified that she put $60.00 on the console and that Cartlidge then told her the drugs were on the back seat of the vehicle. Tr. 175. L.S. stated that she saw a "little silver package" sitting on the seat. Tr. 175. She took the package and left the vehicle. Tr. 175-176. Detectives Boyer and Joseph then followed the vehicle that L.S. had entered to a Kroger Fuel Mart and then to an apartment complex. Tr. 218, 229. Both detectives were able to identify Cartlidge when he exited the vehicle at the apartment complex. Tr. 218, 229. L.S. returned to the police and gave the officers the silver package. Tr. 129, 176. The officers then conducted a post-operational search of L.S.'s person. Tr. 129. The contents of the silver package were later tested and found to contain fentanyl. Tr. 201.

{¶5} The police apprehended Cartlidge on September 12, 2018. Tr. 137. Cartlidge was found with a cell phone and $522.00 in cash on his person. Tr. 137. The cash on his person included a twenty-dollar bill that had a serial number that matched one of the serial numbers that the police had copied from one of the bills that had been issued to L.S. for use in the controlled buy. Tr. 138-139. Further, the number that L.S. had called to contact Cartlidge matched the number of the cell

phone that was found in Cartlidge's possession.  Tr. 139-140.  On September 12, 2018, Cartlidge was sentenced to a term of imprisonment for previous offenses that are unrelated to the facts of this case.  Sentencing Tr. 7.  He was then imprisoned in a correctional institution in the State of Ohio.  Doc. 5.

{¶6} On September 26, 2018, Cartlidge was indicted on one count of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), (C)(1)(b);[1] one count of trafficking in heroin in violation of R.C. 2925.03(A)(1), (C)(6)(a); and one count of corrupting another with drugs in violation R.C. 2925.02(A)(3), (C)(1)(a).  Doc. 1.  On February 20, 2019, Cartlidge was served with this indictment at the Marion Correctional Institution.  Doc. 5.  The record indicates that he remained in imprisoned at the Marion Correctional Institution through the time of his trial.  Doc. 5, 6, 11, 12, 13, 14, 31, 44.  On August 21, 2019, the State filed a motion to dismiss the second and third counts listed in Cartlidge's indictment.  Doc. 32.  The trial court granted this motion to dismiss on August 22, 2019.  Doc. 33.

{¶7} On August 22, 2019, the Defense filed a motion to discharge the defendant for a violation of his speedy trial rights.  Doc. 35.  On August 26, 2019, the State and the Defense met in the trial judge's chambers.  Doc. 36.  The trial court heard the Defense's arguments regarding the alleged speedy trial violation and then

---

[1] On August 15, 2019, the State filed a motion to amend the first count in this indictment to reflect a revision of R.C. 2925.03.  Doc. 27.  In this motion, the State requested that the first count be changed from aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), (C)(1)(b) to trafficking in a fentanyl related compound in violation of R.C. 2925.03(A)(1), (C)(9)(b).  Doc. 27.  The trial court granted this motion on August 16, 2019.  Doc. 28.

denied the motion to discharge. Doc. 37. At this meeting, the Defense also alleged that it had faxed a motion to suppress to the Seneca County Clerk of Courts on August 20, 2019. Doc. 36. After the trial court inquired, the Seneca County Clerk of Courts reported that it did not have a record of receiving this filing by fax. Doc. 36. The State did confirm that it received this motion to suppress via email. Doc. 36. The Defense then made an oral motion for leave to file out of time. Doc. 36. The trial court denied this motion. Doc. 36.

{¶8} Cartlidge's jury trial occurred on August 26, 2019. Tr. 1. On August 27, 2019, the jury returned a verdict of guilty on the charge of trafficking in a fentanyl-related compound. Doc. 38. The trial court held Cartlidge's sentencing hearing on September 27, 2019. Doc. 41. The trial court issued its judgment entry of sentencing on October 1, 2019. Doc. 41. On November 6, 2019, the appellant filed a motion for a delayed appeal, which was granted by this Court.. Doc. 49. On appeal, Cartlidge raises the following five assignments of error:

**First Assignment of Error**

**Appellant's conviction should be reversed because it was against the manifest weight of the evidence.**

**Second Assignment of Error**

**Appellant's conviction should be reversed because it was not supported by sufficient evidence.**

**Third Assignment of Error**

**Appellant was not provided effective assistance of counsel when appellant's attorney failed to timely file a motion to suppress.**

**Fourth Assignment of Error**

**The sentence should be reversed because the trial court erred in ordering appellant to pay court-appointed counsel fees without first considering appellant's present and future ability to pay.**

**Fifth Assignment of Error**

**Whether the trial court erred when denying appellant's motion to dismiss for violation of a speedy trial.**

For the sake of analytical clarity, we will consider Cartlidge's second assignment of error before we examine his first assignment of error.

*Second Assignment of Error*

{¶9} Cartlidge argues that his conviction for trafficking in a fentanyl-related compound is not supported by sufficient evidence.

Legal Standard

{¶10} A challenge to the sufficiency of the evidence supporting a conviction "is a question of law and a 'test of adequacy rather than credibility or weight of the evidence.'" *State v. Beaver*, 3d Dist. Marion No. 9-17-37, 2018-Ohio-2438, ¶ 40, quoting *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19. "The sufficiency-of-the-evidence analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v.*

*Luebrecht*, 3d Dist. Putnam No. 12-18-02, 2019-Ohio-1573, ¶ 36, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12.  On appeal, the applicable standard

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 8, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 73 (3d Dist.).

{¶11} In order to establish that Cartlidge committed the offense of trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(1), (C)(9)(b), the State had to introduce evidence that he "[1] knowingly * * * [2] s[old] or offer[ed] to sell * * *" "[3] a fentanyl-related compound * * *" [4] "in the vicinity of a juvenile * * *."  R.C. 2925.03(A)(1), (C)(9)(b).

Legal Analysis

{¶12} In this case, L.S. testified that she had worked with the Seneca County Drug Task Force as an undercover informant.  Tr. 159.  She stated that she had known Cartlidge for several months and that he contacted her to tell her that he "was back in town" on September 10, 2018.  Tr. 163.  After this interaction, L.S. testified that she contacted Detective Bell and then arranged to purchase heroin from Cartlidge.  Tr. 164.  L.S. testified that she met with the police at a predetermined location; that her person was searched by the police; and that nothing was found on

her. Tr. 165. L.S. stated that she was outfitted with a recording device and was given sixty dollars to make a purchase in the controlled buy. Tr. 165.

{¶13} L.S. then stated that she called Cartlidge at this point and proceeded to meet him at the library. Tr. 164, 166, 168, 173. The State offered a recording of this conversation into evidence. Ex. 1. On this recording, a person, who L.S. identified as Cartlidge, said, "Meet me at the library." Ex. 1. She testified that the police dropped her off in the vicinity of the local public library and that she walked from where she was dropped off to the parking lot of the library. Tr. 174. In the parking lot, she entered into the back seat of a "brown Blazer." Tr. 174. She stated that Cartlidge was sitting inside in the front passenger seat of the vehicle and that a woman entered the vehicle at roughly the same time as she (L.S.) entered the vehicle. Tr. 190. L.S. testified that, at the time she was in the vehicle with Cartlidge, there was a child present. Tr. 174. She stated that this child appeared to be around two years of age. Tr. 174.

{¶14} L.S. stated that she placed sixty dollars in cash on the console and that Cartlidge told her that the drugs were on the back seat next to her. Tr. 175. She said that she looked and saw a "little silver package" next to her. Tr. 175, 178. She testified that she retrieved this package; left the vehicle; and met Detective Bell. Tr. 176, 178. She stated that she gave this package to the police; that she was searched; and that no other contraband was found on her person. Tr. 176, 178. At trial, she testified that she called Cartlidge to set up a controlled-buy of heroin; that Cartlidge

told her where the drugs were on the back seat; and affirmed that no one else was involved in this transaction. Tr. 175-176, 190.

{¶15} Detective Boyer testified that he had surveilled L.S. during the course of the controlled buy and that he watched her enter a vehicle in the parking lot of the public library. Tr. 227. He testified that he saw a child enter into Cartlidge's vehicle with a woman at the same time that L.S. entered into the vehicle. Tr. 228. He testified that this child appeared to be under the age of four or five. Tr. 228. He stated that, after L.S. exited the vehicle in the library parking lot, he continued to follow this vehicle. Tr. 228. He testified that he watched this vehicle go to a fueling station at Kroger's and then to an apartment complex called the Governor's Manor. Tr 228-229. He affirmed that he saw a man exit the vehicle at the Governor's Manor and that he was able to "positively identify" this man as Cartlidge. Tr. 229.

{¶16} Detective Bell testified that L.S. was issued sixty dollars of covert funds at the predetermined location to purchase the drugs in the controlled buy. Tr. 122. He also testified that L.S. gave him the drugs that she had purchased after the controlled buy. Tr. 129. Detective Jim Chandler testified that he transported the silver package and its contents to the Bureau of Criminal Investigations ("BCI"). Tr. 208. Dr. Samuel K. Fortener ("Dr. Fortener") works as a forensic scientist for BCI. Tr. 193. He testified that the silver package in evidence in this case contained "a white substance weighing 0.12 gram, plus or minus 0.04 gram * * *." Tr. 201,

204. He further testified that this white compound contained Fentanyl. Tr. 201. Dr. Fortener also testified that Fentanyl is a Schedule II Drug. Tr. 196.

{¶17} In this assignment of error, Cartlidge asserts that the State was unable to establish whether the compound examined at BCI and presented as an exhibit at trial was the compound that L.S. obtained during the controlled buy. At trial, the State questioned several witnesses regarding the chain of custody of this compound. L.S. testified that she handed the compound in a silver wrapper to Detective Bell. Tr. 177. Detective Bell stated that he placed this package into an evidence bag; placed identifying markers on the bag; and prepared it for transport to BCI. Tr. 130-131. Detective Jim Chandler ("Detective Chandler") testified that he transported the evidence to BCI. Tr. 207. Dr. Fortener testified about the protocols that governed the handling of this evidence while it was at BCI. Tr. 197-199. Detective Shawn Vallery ("Detective Vallery") testified that he retrieved this evidence from BCI. Tr. 211. Thus, the State produced some evidence that, if believed, establishes the chain of custody for this drug compound.

{¶18} After reviewing the record in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found that the State had produced some evidence to substantiate each of the essential elements of the crime of trafficking in a fentanyl-related compound. The evidence produced at trial is legally sufficient to support the challenged conviction. For this reason, Cartlidge's second assignment of error is overruled.

*First Assignment of Error*

**{¶19}** Cartlidge argues that his conviction for trafficking in a fentanyl-related compound is against the manifest weight of the evidence.

Legal Standard

**{¶20}** In a manifest weight analysis, "an appellate court's function * * * is to determine whether the greater amount of credible evidence supports the verdict." *Plott, supra*, at ¶ 73. Thus, "the appellate court sits as a 'thirteenth juror' * * *." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Appellate courts

> **must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'**

*State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting *Thompkins* at 387.

**{¶21}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "[I]t is well established that the * * * credibility of the witnesses [is] primarily a matter for the trier of fact." *State v. Gervin*, 2016-Ohio-8399, 79 N.E.3d 59, ¶ 142 (3d

Dist.), quoting *State v. Clark*, 101 Ohio App.3d 389, 409, 655 N.E.2d 795 (8th Dist. 1995). "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis

{¶22} Cartlidge advances four main arguments in support of his assertion that his conviction is against the manifest weight of the evidence. We will consider each of these arguments in turn. First, Cartlidge argues that L.S. is not a credible witness. At trial, L.S. stated that she was working as a confidential informant in exchange for consideration on a traffic ticket. Tr. 162. *See* Tr. 121. She also stated that she was a recovering drug addict and was in treatment for her addiction at the time of the trial. Tr. 161. She also admitted that she had convictions for misdemeanor theft, complicity to breaking and entering, complicity to safe cracking, and complicity to theft. Tr. 161-162. She stated that she did not receive any consideration for these offenses in exchange for being a confidential informant. Tr. 162.

{¶23} We note that a number of L.S.'s statements at trial were corroborated by the police officers involved in this operation and by various recordings. There was a recording of a phone conversation between Cartlidge and L.S. from just before L.S. went to the library. Ex. 1. Detective Bell testified that L.S. was searched at

the predetermined location before the controlled buy. Tr. 141. Detective Bell testified that he conducted visual surveillance of L.S. as she walked to the library and that he did not observe L.S. interact with anyone besides Cartlidge on this walk or make any detours. Tr. 127.

{¶24} Detective Boyer testified that dropped off L.S. near the library and that he observed L.S. enter a vehicle in the library parking lot. Tr. 227. He also testified that he witnessed a woman and a child enter the vehicle at the same time as L.S. and that he observed L.S. leave the vehicle after a short amount of time inside it. Tr. 218, 228, 232. Detective Joseph testified that he heard Detective Boyer state, over the radio, that he saw a woman and a child enter the vehicle. Tr. 218. Detective Joseph also testified that he watched L.S. walk away from the vehicle after the controlled buy. Tr. 218.

{¶25} Detective Bell testified that he picked up L.S. "[i]mmediately" after the controlled buy and that he searched her once they had returned to the predetermined location. Tr. 127-129. He further stated that L.S. gave him the package that she had obtained in the vehicle during the controlled buy. Tr. 129. Detectives Joseph and Boyer testified that they followed the vehicle that L.S. had entered and identified the person who exited this vehicle as Cartlidge. Tr. 153, 218-219, 299.

{¶26} In the end, a "[m]ere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v.*

*Cervantes*, 10th Dist. Franklin No. 18AP-505, 2019-Ohio-1373, ¶ 28, quoting *State v. Harris*, 10th Dist. Franklin No. 13AP-770, 2014-Ohio-2501, ¶ 25. The jury was "free to believe or disbelieve any or all of the testimony presented" by L.S. at trial. *State v. Crump*, 190 Ohio App.3d 286, 2010-Ohio-5263, 941 N.E.2d 859, ¶ 26 (10th Dist.).

**{¶27}** Second, Cartlidge points to the fact that the video recording device with L.S. did not capture any footage of him in the vehicle during the controlled buy. Tr. 187. Ex. 4. L.S. testified that the camera was in her hand and that she could not position it to capture footage of Cartlidge without revealing the camera's presence. Tr. 173. However, L.S. identified Cartlidge as the person that she met in the vehicle in the library parking lot. Tr. 162-163, 174, 178. Further, after the controlled buy, two police detectives followed the vehicle that L.S. had entered and were able to identify Cartlidge as the individual who exited the vehicle. Tr. 218-219, 229.

**{¶28}** Thus, at trial, there were three witnesses who provided testimony that placed Cartlidge in the vehicle in the library parking lot with L.S. Tr. 174, 218-219, 229. The jury, as the finder of fact, was "free to believe or disbelieve any or all of [this] testimony * * *." *Crump, supra*, at ¶ 26. The fact that the video recording device did not capture footage of Cartlidge in the vehicle with L.S. does not mean that his conviction is against the manifest weight of the evidence. *See State v. Chaffin*, 4th Dist. Scioto No. 16CA3769, 2017-Ohio-7622, ¶ 36-37.

{¶29} Third, Cartlidge asserts that there were two adults in the vehicle with L.S. and that either one of them could have placed the drugs on the back seat or received L.S.'s money. On cross-examination, L.S. stated that she did not see who placed the package containing the controlled substance on the back seat. Tr. 186. She also indicated that she did not give the money directly to Cartlidge but placed the money on the console in the vehicle. Tr. 186. However, L.S.'s testimony directly implicated Cartlidge as the individual with whom she set up this controlled buy. Tr. 163-164, 172, 175, 178, 184, 188.

{¶30} At trial, L.S. testified that Cartlidge initially reached out to her, telling her that he was "back in town." Tr. 163. She stated that she called Cartlidge to set up a controlled buy of heroin from him. Tr. 164, 184. She also called Cartlidge as she was walking to the agreed-upon location for the controlled buy. Tr. 172, 178, 188. This call was recorded and played at trial. Tr. 166, 188. Ex. 1. While she was in the vehicle, L.S. stated that Cartlidge told her where the drugs were and told her to leave. Tr. 175. When the police apprehended Cartlidge, he had a phone that matched the number that L.S. had used to contact him. Tr. 139-140. At the time of his arrest, he also had, in his possession, one of the bills that L.S. was issued to use in the controlled buy. Tr. 139. Ex. 7.

{¶31} At trial, L.S. also affirmed that no one else in the vehicle besides Cartlidge participated in this controlled-buy transaction. Tr. 175-176. She testified that she did not know the woman who entered the vehicle in the library parking lot;

that she had never spoken with this woman; and that she did not interact with this woman in setting up the controlled buy. Tr. 190. She further affirmed that she set up the controlled buy with Cartlidge. Tr. 190. A jury could reasonably find, based on this evidence, that Cartlidge was the person who had sold the drugs to L.S. *See State v. Smith*, 193, Ohio App.3d 201, 2011-Ohio-997, 951 N.E.2d 469, ¶ 18 (3d Dist.).

{¶32} In his fourth argument, Cartlidge points to an exchange between L.S. and the State regarding the identification of the silver package she allegedly obtained from Cartlidge. This exchange reads as follows:

> **[State]: And was that the same package that you turned over to Detective Bell?**
>
> **[L.S.:] This—it was in a silver gum wrapper, like it was in a Trident gum wrapper, I'm sorry, but it's not in—this is not in a gum wrapper.**
>
> **[State:] But you initialed that package?**
>
> **[L.S.:] I initialed the plastic thing, I agree, but this is not—I'm sorry. But this is—**
>
> **[State:] Can we open it up, Your Honor—**
>
> **[The Court:] Sure.**
>
> **\* \* \***
>
> **[State:] I'm not going to have her open up the smaller package yet. It's potentially dangerous. Would you prefer the witness to open it or—**

-16-

**[The Court:] No. Just let the record reflect, I mean everybody's watching. You can open it. \* \* \***

**\* \* \***

**[State:] I'm not going to cut any of the markings.**

**[State:] Is that easier to see now?**

**[L.S.:] No, it just looks like powder.**

**[State:] So that—**

**[L.S.:] Yeah, it just looks like—I don't see—**

**[State:] You don't see—do you see the original packaging that it was in when you turned it over to Detective Bell?**

**[L.S.:] I can't see it, I'm sorry.**

**[State:] That's fine.**

Tr. 178-180. Cartlidge asserts that this exchange indicates that the compound that was examined at BCI was not the compound that L.S. gave to the police after the controlled buy. However, at trial, the State questioned several witnesses to establish the chain of custody for this piece of evidence.

{¶33} At trial, L.S. testified that she gave the silver package that contained the drugs to Detective Bell after the controlled buy. Tr. 177. She testified that Detective Bell then packaged it in the evidence bag and had her initial and date the evidence bag. Tr. 178. During her testimony, L.S. was able to identify her initials on the evidence bag but could not see the silver wrapper. Tr. 178-179. Detective Bell also identified the evidence bag in the following exchange:

> **[State:] Detective, I'm handing you what has been marked as State's Exhibit Number 2. Could you please take a look at that and tell us what that is?**
>
> **[Detective Bell:] State's Exhibit Number 2 is the item that was obtained during the controlled purchase operation TF-18-176 on September 10, 2018; the item that was obtained by [L.S.] from Mr. Cartlidge.**
>
> **[State:] And how do you know that that's the item turned over to you from the confidential informant after the operation?**
>
> **[Detective Bell:] I placed it into the bag. It also has our unique markings. As you can see the white label here (indicating) is a task force evidence label. This label is used by us for our in-house system to make sure that these items from a specific case are housed, and any time they leave or enter or there were more chain of custody changes that bar code is scanned in order to keep that control. This item also has the initials and date from the confidential informant. Again, once it was placed into the evidence bag I have that confidential informant initial and date this bag. As well as the back, you can see my initials here (indicating) that these items were opened by me after the operation, and I put my initials here on the seal to show that I conducted the opening of that.**
>
> **[State:] Is the state's exhibit in the same or substantially the same condition as when you received it from the confidential informant on September 10, 2018?**
>
> **[Detective Bell:] Aside from the additional label and the markings here on the seal, yes.**

Tr. 130-131. Detective Bell then testified that this evidence was sent to BCI after he put this package into the evidence bag. Tr. 131.

{¶34} The State also called Detective Chandler and Detective Vallery to testify about the chain of custody for the drug compound. Tr. 207, 211. Detective

Chandler testified that he transported this evidence bag to BCI. Tr. 208. He stated that the bag was in his sole care and custody during the transport and that the evidence bag was, at trial, in substantially the same condition as when he transported it. Tr. 208-209. Detective Vallery testified that he retrieved this evidence bag from BCI after the tests had been completed. Tr. 212. He further identified his initials on the evidence bag and testified that the evidence was, at trial, in substantially the same condition as when he retrieved it. Tr. 213.

{¶35} Dr. Fortener testified that he examined the contents of the evidence bag at BCI and verified that the evidence bag at trial was from the Cartlidge case. Tr. 197-199. The following exchange occurred while he was testifying:

> [State:] Okay. And in this case, and I know you testified to it but I apologize, it wasn't that clear to me, what happened to the silver package?
>
> [Dr. Fortener:] So the silver package could be inside of this plastic bag. Typically, think of a gum wrapper over time they kind of get flimsy so they're not as—as easy for them to contain a substance. So to prevent any kind of spilling out into this plastic evidence bag, we then place it inside a Ziploc bag so it's more secure.
>
> [State:] Before or after the test?
>
> [Dr. Fortener:] After the testing was done. So we would have opened it up. Inside this plastic bag would have been a foil gum wrapper that would have been, the contents would have been dumped out of that to be weighed and analyzed. They were then placed back into that, folded up, and then put inside the Ziploc bag that the laboratory provided to better secure the evidence for return to the department.
>
> [State:] So the silver then is there, the silver package is in there?

**[Dr. Fortener:] Yes, sir.**

**[State:] And can you see it in there?**

**[Dr. Fortener:] The plastic bag and Ziploc bag is folded up so without actually opening up this bag, no sir.**

Tr. 204-205. *See State v. McFarland*, 5th Dist. Muskingum No. CA-92-7, 1993 WL 35329, *4 (Jan. 15, 1993) (holding that a bag of drugs introduced as an exhibit was "sufficiently identified" by the police and a forensic scientist from BCI even though the confidential informant was unable to identify the bag of drugs).

{¶36} In this case, the State questioned a number of witnesses to establish the chain of custody for this evidence. Further, the State also elicited testimony from Dr. Fortener that offered a potential explanation as to why L.S. may not have been able to identify the silver wrapper in the evidence bag while she was testifying. Tr. 204-205. *See State v. Brown*, 107 Ohio App.3d 194, 668 N.E.2d 514, (3d Dist. 1995), citing *McFarland* at *4. From the testimony at trial, a jury could reasonably find that the drugs in the evidence bag were the drugs that L.S. obtained during the controlled buy.

{¶37} Having considered the evidence on the basis of its weight and credibility, we conclude that this is not the exceptional case in which the evidence weighs heavily against the conviction. The four arguments that Cartlidge raises in this assignment of error do not establish that his conviction is against the manifest weight of the evidence. Further, after reviewing the evidence in the record, we do

not find any indication that the jury lost its way and returned a verdict against the manifest weight of the evidence. Cartlidge's first assignment of error is overruled.

*Third Assignment of Error*

**{¶38}** Cartlidge argues that he was denied his right to the effective assistance of counsel because his defense attorney did not file a motion to suppress.

Legal Standard

**{¶39}** "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 57, quoting *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). For this reason, the appellant has the burden of proving that he or she was denied the right to the effective assistance of counsel. *Brown, supra*, at ¶ 42. "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *State v. McWay*, 3d Dist. Allen No. 1-17-42, 2018-Ohio-3618, ¶ 24, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶40}** In order to establish deficient performance, the appellant must demonstrate that trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 35, quoting

*Strickland* at 687. In order to establish prejudice, "the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Davis, supra*, at ¶ 36, quoting *State v. Bibbs*, 2016-Ohio-8396, 78 N.E.3d 343, ¶ 13 (3d Dist.). If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test. *State v. Baker*, 3d Dist. Allen No. 1-17-61, 2018-Ohio-3431, ¶ 19, citing *State v. Walker*, 2016-Ohio-3499, 66 N.E.3d 349, ¶ 20 (3d Dist.).

**{¶41}** "[F]ailure to file a suppression motion does not constitute per se ineffective assistance of counsel." *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52, 64 (2000), quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305, 325 (1986). To establish that counsel was ineffective for failing to file a motion to suppress, the appellant must demonstrate "that the motion [to suppress] would have been successful if made." *State v. Kennedy*, 3d Dist. Logan No. 8-18-01, 2018-Ohio-4172, ¶ 32. Beyond determining the reasonable probability of success for a motion to suppress, courts consider whether "the evidence, if excluded, would have changed the result of the trial." *State v. McDuffie*, 3d Dist. No. 9-2000-92, 2001 WL 542114, *2 (May 23, 2001).

Legal Analysis

**{¶42}** In his brief, Cartlidge points to the fact that his trial counsel had prepared a motion to suppress but failed to verify that the trial court received this

motion.[2] *See* Doc. 36. On appeal, Cartlidge asserts that, if this motion had been granted, the items found in his possession at the time of his arrest would not have been admissible at trial. Specifically, Cartlidge identifies his cell phone and the twenty-dollar bill from the covert funds items that had been issued to L.S. would have been suppressed. However, Cartlidge has not, on appeal, advanced an argument that explains how the absence of these two items at his trial would have changed the outcome of the proceeding.

{¶43} Even in the absence of this evidence, the testimony at trial still established that, L.S. participated in a controlled-buy operation. Tr. 120, 159. The police thoroughly searched her person before the controlled buy. Tr. 124, 151, 217. While under police surveillance, L.S. went into a vehicle with sixty dollars of covert funds. Tr. 122, 124, 227-228. While under police surveillance, L.S. returned from this vehicle without the sixty dollars in covert funds and with a compound that

---

[2] The motion to suppress purportedly argued that there was not probable cause for the arrest warrant that was issued for Cartlidge. In his brief, Cartlidge represents that this motion argued that the arrest warrant erroneously stated that there was video footage of Cartlidge engaging in a drug transaction. Appellant's Brief, 17. Cartlidge asserts that, if this motion had been successfully filed, the items found on his person at the time of his arrest would have been suppressed. In response, the State asserts that the application for the arrest warrant did not state that there was video footage of Cartlidge selling drugs in a controlled buy but stated that video and audio recording devices were used during this controlled-buy operation. Appellee's Brief, 9. In this case, the record does not contain a copy of the application for the warrant to arrest Cartlidge. For this reason, we cannot fully evaluate whether a motion to suppress would have had a reasonable probability of success. However, this does not mean that we cannot evaluate this claim on appeal. In cases where the appellant alleges that his or her trial counsel was ineffective for failing to file a motion to suppress, there is not, as a general matter, a copy of the motion to suppress in the record because the alleged deficiency was that the motion to suppress was not filed. In such a situation, the appellant identifies the evidence in the record that would have been suppressed had a motion to suppress been filed. While we cannot make a decision based on the record as to whether there was a reasonable probability that this motion would have been granted, we can evaluate whether Cartlidge has demonstrated whether the outcome of his trial would have been different in the absence of the evidentiary materials that he alleges would have been suppressed if a motion to suppress had been filed and granted.

contained fentanyl. Tr. 127-129, 218. The police thoroughly searched L.S.'s person after the controlled buy. Tr. 129, 141, 217. The police then followed the vehicle L.S. had entered and verified that Cartlidge had been inside of that vehicle. Tr. 134, 137, 153, 218-219, 229.

{¶44} L.S. also testified that she had called Cartlidge to set up a time to purchase heroin. Tr. 163-164, 190. There was an audio recording of L.S. calling a person, who she identified as Cartlidge, to set up a meeting at the library for the controlled buy. Tr. 166. Ex. 1. L.S. testified that Cartlidge was inside the vehicle and told her where the drugs were on the back seat. Tr. 174-175, 190. She also affirmed that no one besides Cartlidge was involved with her in this transaction. Tr. 190.

{¶45} Even assuming that a motion to suppress these evidentiary materials had a reasonable probability of being granted, Cartlidge has not, on appeal, advanced an argument that demonstrates how the absence of his cell phone and this twenty-dollar bill as evidence at his trial would have led the jury to find him not guilty. In failing to make such an argument, he has failed to carry the burden of demonstrating how his rights were prejudiced by his trial counsel's allegedly deficient performance. For this reason, he has failed to establish an ineffective assistance of counsel claim. Cartlidge's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶46}** Cartlidge argues that the trial court erred by ordering him to pay for his court appointed counsel without first considering his ability to pay these costs.

Legal Standard

**{¶47}** R.C. 2941.51 governs the imposition of court-appointed counsel fees and reads, in its relevant part, as follows:

> **(D) The fees and expenses approved by the court under this section shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay.**

R.C. 2941.51(D).

> **[A] trial court's order to pay court-appointed counsel fees is distinguishable from both court costs and financial sanctions. Court-appointed counsel fees and expenses approved by a court are not court costs or a financial sanction, and they are not directly enforceable as a criminal sanction. R.C. 2941.51(A);** *State v. Springs*, **2d Dist. Champaign No. 2015-CA-3, 2015-Ohio-5016, ¶ 9. R.C. 2941.51(D) specifically provides that court-appointed counsel fees 'shall not be taxed as part of the costs and shall be paid by the county.' Nevertheless, 'if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay.' R.C. 2941.51(D).**

*State v. Junod*, 3d Dist. Mercer No. 10-18-08, 2019-Ohio-743, ¶ 66.

> **[A]n indigent defendant may properly be required to pay his attorney fees only after the court makes an affirmative determination on the record in the form of a journal entry that**

**the defendant has, or reasonably may be expected to have, the means to pay all or some part of the cost of the legal services rendered to him. The court must then enter a separate civil judgment for the attorney fees or any part thereof that the court finds the defendant has the ability to repay.**

*State v. Schaeffer*, 3d Dist. Seneca No. 13-19-10, 2019-Ohio-2481, ¶ 8, quoting

*State v. Shaffer*, 3d Dist. Union No. 14-09-06, 2009-Ohio-4804, ¶ 5.

Legal Analysis

**{¶48}** As the State of Ohio concedes in its brief, the record in this case does not contain any indication that the trial court made an affirmative determination that Cartlidge had the ability to pay the costs of his court-appointed counsel fees or considered Cartlidge's present or future ability to pay these costs. *See State v. Parks*, 3d Dist. Nos. 13-19-18 and 13-19-19, 2020-Ohio-145, ¶ 40. *See* Sentencing Tr. 15. Doc. 41. Further, the trial court's judgment entry of sentencing does not contain a finding that Cartlidge has a present or future ability to pay for his court-appointed counsel fees. Doc. 41. *See Schaeffer* at ¶ 9.

**{¶49}** Thus, "we vacate that portion of the trial court's judgment imposing the court-appointed [counsel] fees and remand this matter for the trial court to either conduct a hearing as to [Cartlidge's] ability to pay the attorney's fees pursuant to R.C. 2941.51(D) or in the alternative, to file an amended judgment entry that omits the imposition of those attorney's fees." *Junod, supra*, at ¶ 68. Cartlidge's fourth assignment of error is sustained.

*Fifth Assignment of Error*

{¶50} Cartlidge argues that the trial court erred in denying his motion to dismiss for a speedy trial violation.

Legal Standard

{¶51} The United States Constitution and the Ohio Constitution guarantee "a speedy trial to a person who has been accused of a crime." *State v. Hines*, 3d Dist. Marion No. 9-19-07, 2019-Ohio-5039, ¶ 11, citing *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 11. Ohio has addressed a defendant's right to a speedy trial in several provisions in the Revised Code. R.C. 2945.71, *et seq*. R.C. 2941.401. Ohio's general speedy trial statutes are located in R.C. 2945.71, *et seq*. *State v. Irish*, 2019-Ohio-2765, 140 N.E.3d 209, ¶ 12 (3d Dist.). Under R.C. 2945.71(C)(2), "[a] person against whom a charge of felony is pending * * * [s]hall be brought to trial within two hundred seventy days after the person's arrest." R.C. 2945.71(C)(2).

{¶52} Where the general speedy trial statute is applicable, it "is mandatory and must be construed strictly against the state." *State v. McRae*, 3d Dist. Shelby No. 17-17-23, 2018-Ohio-3435, ¶ 20. "This 270-day period may be extended for one or more of the reasons listed in R.C. 2945.72(A)-(I)." *Irish* at ¶ 12. "Upon a motion made prior to or at the trial, 'a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71

and 2945.72 of the Revised Code.'" *State v. Pooler*, 3d Dist. Logan No. 8-16-02, 2016-Ohio-5099, ¶ 21, quoting R.C. 2945.73(B).

{¶53} However, R.C. 2941.401 contains "a 'specific' speedy-trial statute applicable only to defendants who are imprisoned in correctional institutions in the State of Ohio and facing charges for crimes separate from those for which they are already imprisoned." *Irish, supra*, at ¶ 13. This provision reads, in its relevant part, as follows:

> **When a person has entered upon a term of imprisonment in a correctional institution of this state, and when during the continuance of the term of imprisonment there is pending in this state any untried indictment, information, or complaint against the prisoner, he shall be brought to trial within one hundred eighty days after he causes to be delivered to the prosecuting attorney and the appropriate court in which the matter is pending, written notice of the place of his imprisonment and a request for a final disposition to be made of the matter, except that for good cause shown in open court, with the prisoner or his counsel present, the court may grant any necessary or reasonable continuance.**
>
> **\* \* \***
>
> **The written notice and request for final disposition shall be given or sent by the prisoner to the warden or superintendent having custody of him, who shall promptly forward it with the certificate to the appropriate prosecuting attorney and court by registered or certified mail, return receipt requested.**
>
> **The warden or superintendent having custody of the prisoner shall promptly inform him in writing of the source and contents of any untried indictment, information, or complaint against him, concerning which the warden or superintendent has knowledge, and of his right to make a request for final disposition thereof.**

* * *

> **If the action is not brought to trial within the time provided, subject to continuance allowed pursuant to this section, no court any longer has jurisdiction thereof, the indictment, information, or complaint is void, and the court shall enter an order dismissing the action with prejudice.**

R.C. 2941.401. Where applicable, this statutory provision is "mandatory and must be strictly complied with by the trial court." *State v. Smith*, 140 Ohio App.3d 81, 86, 746 N.E.2d 678, 682 (3d Dist.).

**{¶54}** "[W]hen a person who is imprisoned in an Ohio correctional institution is charged with a crime separate from the crime for which they are imprisoned, R.C. 2941.401 applies to the exclusion of R.C. 2945.71." *Irish, supra*, at ¶ 17. "Generally, for as long as such a defendant remains imprisoned in an Ohio correctional institution, statutory speedy-trial time will not begin to run until the defendant files a request for disposition in accordance with R.C. 2941.401." *Id*. Thus, "[w]hen a defendant is serving time in state prison, the speedy-trial time for pending charges is tolled and R.C. 2941.401's provisions prevail over conflicting provisions of R.C. 2945.71." *Id*. at ¶ 15, quoting *State v. Charity*, 7th Dist. Mahoning No. 12 MA 214, 2013-Ohio-5385, ¶ 24. *See* R.C. 2945.71(F).

**{¶55}** On appeal, a speedy trial issue presents a mixed question of fact and law. *State v. Gartrell*, 2014-Ohio-5203, 24 N.E.3d 680, ¶ 104 (3d Dist.).

> **"We accept the facts as found by the trial court on some competent, credible evidence, but freely review the application of the law to the facts." *State v. Kist*, 173 Ohio App.3d 158, 2007-**

> **Ohio-4773, 877 N.E.2d 747, ¶ 18 (11th Dist.). "The computation of time for criminal statutes is governed by Crim.R. 45, which provides, '[i]n computing any period of time prescribed * * * by any applicable statute, the date of the act or event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included * * *.'"** *State v. Shafer*, **3d Dist. Logan No. 8-14-28, 2015-Ohio-2469, ¶ 12, quoting Crim.R. 45. 'If any ambiguity exists, we construe the record in favor of the accused.'** *Id.*

*State v. Flynn*, 3d Dist. Paulding No. 11-16-06, 2017-Ohio-1484, ¶ 10.

Legal Analysis

{¶56} On appeal, Cartlidge argues that the State failed to bring him to trial within the 270-day period required under R.C. 2945.71(C)(2) and, in so doing, violated his statutory speedy trial rights.[3] However, it is undisputed that Cartlidge had been imprisoned in an Ohio correctional institution on charges unrelated to this case before he was indicted on September 26, 2018. Sentencing Tr. 7. Doc. 1, 5. *See* R.C. 2941.401. *See Charity, supra*, at ¶ 25; *Irish, supra*, at ¶ 2. It is further undisputed that he then remained in the custody of an Ohio correctional institution from the date of his indictment through the date of his trial on August 26, 2019. Tr. 1. Doc. 5, 6, 11, 12, 13, 14, 31, 44.

{¶57} Since Cartlidge was imprisoned for the duration of the time that this charge was pending against him, "R.C. 2941.401 applied to the exclusion of R.C.

---

[3] In his brief, Cartlidge argues that his constitutional speedy trial rights were violated because his statutory speedy trial rights were violated. His arguments rest on the State's alleged failure to comply with R.C. 2945.71, *et seq.* He does not raise any arguments that implicate the standard for constitutional speedy trial right violations. For this reason, we will only perform the statutory speedy trial analysis.

2945.71 * * *." *Irish, supra*, at ¶ 18. For this reason, "R.C. 2941.401's provisions prevail over [the] conflicting provisions of R.C. 2945.71" and operate to toll the speedy trial time from accruing under R.C. 2945.71. *Irish, supra*, at ¶ 15, quoting *Charity, supra*, at ¶ 24. Thus, contrary to the arguments in the appellant's brief, there is no time in between Cartlidge's indictment on September 26, 2018 and his trial on August 26, 2019 that would have accrued under R.C. 2945.71.

{¶58} For this reason, we will continue our analysis by considering the facts of this case under R.C. 2941.401. The 180-day period in R.C. 2941.401 begins to run when the incarcerated defendant "causes to be delivered to the prosecuting attorney and the appropriate court in which the matter is pending, written notice of the place of his imprisonment and a request for a final disposition to be made of the matter." R.C. 2941.401. In this case, there is no indication in the record that Cartlidge caused such written notice to be delivered to the trial court or to the prosecuting attorney. *See State v. Hairston*, 101 Ohio St.3d 308, 2004-Ohio-969, 804 N.E.2d 471, ¶ 24. Neither party contends that Cartlidge engaged in any efforts to trigger the 180-day speedy trial time by complying with the process set forth in R.C. 2941.401.

{¶59} As a result, the 180-day period allotted to the State in R.C. 2941.401 never began to run and did not expire before Cartlidge was brought to trial. *See State v. Mavroudis*, 7th Dist. Columbiana No. 02 CO 44, 2003-Ohio-3289, ¶ 27; *State v. Hubbard*, 12th Dist. Butler No. CA2014-03-063, 2015-Ohio-646, ¶ 39.

Thus, Cartlidge was brought to trial in compliance with the relevant statutory provisions that govern an accused's speedy trial rights.

**{¶60}** After examining the facts in the record, we conclude that Cartlidge's statutory right to a speedy trial was not violated. The record indicates that the charge pending against Cartlidge was resolved by trial before the 180-day period prescribed in R.C. 2941.401 had begun to run. Thus, the trial court did not err in denying Cartlidge's motion to discharge the defendant for a violation of his speedy trial rights. Cartlidge's fifth assignment of error is overruled.

*Conclusion*

**{¶61}** Having found no error prejudicial to the appellant in the particulars assigned and argued in Cartlidge's first, second, third, and fifth assignments of error, the judgment of Seneca County Court of Common Pleas is affirmed as to these issues. Having found error prejudicial to the appellant in the particulars assigned and argued in Cartlidge's fourth assignment of error, the judgment of the Seneca County Court of Common Pleas is reversed as to these issues. We remand this cause to the trial court for further action consistent with this opinion.

*Judgment Affirmed in Part*
*Reversed in Part*
*And Cause Remanded*

**SHAW P.J. and ZIMMERMAN J., concur.**

**/hls**